David **SPATZ** et al.,

v.

Frank J. **NASCONE** and Frank J. Zappala, Jr.

Civ. A. No. 72–847.

United States District Court, W. D. Pennsylvania.

Oct. 12, 1973.

Judd N. Poffinberger, Jr., Pittsburgh, Pa., for plaintiffs.

Walter T. McGough, Pittsburgh, Pa., for defendants.

## OPINION

SNYDER, District Judge.

This matter is before the Court on the defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The action involves an agreement for the sale of real estate located in the State of New York in which the defendants, residents of Pennsylvania, were the sellers, and the plaintiffs' assignee, a resident of Illinois, was the purchaser. It is alleged that, pursuant to the terms of the agreement, the defendants completed their acquisition of the subject premises; completed the construction of a shopping plaza; obtained a lease from S. S. Kresge Company; obtained the requisite mortgage; and conveyed the subject premises as directed to Orchard Park Associates, a joint venture composed solely of the plaintiffs herein. It is further alleged that pursuant to the terms of the agreement, Orchard Park Associates paid to the defendants the full purchase price of $200,000.00, and that, in addition, they performed every other condition precedent to the operation of the agreement.

A dispute arose as to the liability of the defendants to repay the aggregate sum of $72,371.37, being the amount by which the real estate taxes assessed against the parcel for the years 1968 through 1971 exceeded the sum of $20,000.00 per annum. The agreement also provided:

"In addition, after receipt of the fourth of the tax bills (the bill for the fourth of the years described hereinbefore), the difference between such fourth tax bill and the estimated figure of TWENTY THOUSAND DOLLARS ($20,000.00) capitalized at 10.-4% shall be repaid by Seller to Purchaser when such tax is due".

The real estate taxes assessed against the parcel for 1971 were $53,464.49, which capitalized at the rate of 10.4%

would be an additional $321,773.94. In 1969 there was an adjustment made on the agreement to increase the estimated tax figure of $20,000.00 to $22,500.00. This was done to reflect the additional minimum rental of $2,500.00 to be received during the last three months of 1969. Further, the estimated $20,000.00 was increased to $30,000.00 for the years 1970 and 1971 to reflect the additional minimum rental of $10,000.00 to be received by the plaintiffs during 1970 and subsequent years of the lease. Because of the changes, the sums presently claimed by the plaintiffs are: (1) the additional taxes for the years 1969, 1970 and 1971 which equal $49,871.37, and (2) the amount due as the capitalized figure of $225,620.09 ($23,464.49 capitalized at the rate of 10.4%). Thus, the plaintiffs claimed that by the end of 1971 the defendants owed the plaintiffs the total sum of $275,491.46 under the terms of the agreement, which sum the defendants repeatedly refused to pay.

Attached to the plaintiffs' Complaint was a copy of the Agreement which was eleven pages in length and which detailed the property to be conveyed, permitted encumbrances and other documents deemed necessary. Paragraph No. 18 of the Agreement, provides as follows:

"MISCELLANEOUS. Risk of loss to the date of closing shall be upon the Seller. This Agreement shall be interpreted under Pennsylvania law and any disputes hereunder shall be tried in the Courts of the Commonwealth of Pennsylvania, the parties hereby waiving the right to a jury trial. Any transfer taxes imposed upon this transaction shall be paid by Seller. Seller shall not be bound by any possible custom or practice of the State of New York in connection with the transfer of title to any real estate, such as a presentation of an abstract of title."

To this Complaint, defendants filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b) on the ground that the Court lacked jurisdiction over either the parties or the subject matter of the action, contending that the above quoted section of the agreement was to be interpreted as limiting "any disputes hereunder" to the Courts of the Commonwealth of Pennsylvania.

On February 12, 1973, Judge Joseph F. Weis, Jr. (then District Judge and now on the Third Circuit Court of Appeals) heard oral arguments and received briefs from the parties, and time was enlarged for the filing of additional memorandums by both plaintiffs and defendants. On March 26, 1973, Judge Weis filed a Memorandum and Order treating the motion to dismiss as one for summary judgment and denying the motion without prejudice to renew after a hearing to resolve the disputed factual issue. This Order is set forth in full below as it is pertinent to the discussion herein contained.

## MEMORANDUM AND ORDER

"The question presented to us is whether this Court in a diversity action should decline to exercise jurisdiction because of a contractual provision limiting the forum in which relief can be sought.

Plaintiffs claim that the defendants breached a certain Agreement, dated September 2, 1966 and later amended in October 1969, for the sale of real property located in the State of New York. The defendants moved to dismiss the action under Rule 12(b) of the Federal Rules of Civil Procedure on the ground that Section 18 of the Agreement limits the plaintiffs to maintain their action only in the state courts of Pennsylvania. Section 18 of the Agreement provides:

'. . . This Agreement shall be interpreted under Pennsylvania law and any disputes hereunder shall be tried in the Courts of the Commonwealth of Pennsylvania, the parties hereby waiving the right to a jury trial . . .'

This court finds that the phrase 'Courts of the Commonwealth of Pennsylvania' is ambiguous since it is susceptible of either a possessive or geographic connotation. See 29 Words and Phrases, 'Of', page 341 (1972) where numerous cited cases held that the preposition 'of' does not mean just ownership or possession, but rather has the identical meaning of the preposition 'in' which conveys the meaning of location or inclusion within.

Both parties filed opposing affidavits of fact concerning the discussions that had occurred before the execution of the Agreement as to the meaning of Section 18 of the Agreement. Consequently the motion to dismiss will be treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. See Central Contracting Co. v. Maryland Casualty Co., 367 F.2d 341, 343 (3rd Cir. 1966).

Since Section 18 of the Agreement is ambiguous and there is a genuine factual issue as to its meaning, summary judgment must be denied. See 6 Moore's Federal Practice, § 56.-17(43), page 2590, n.n. 7, 10 (1972); Adickes v. Kress & Co., 398 U.S. 144, 153–161 [90 S.Ct. 1598, 26 L.Ed.2d 142] (1970).

This case will be scheduled for a preliminary hearing to resolve the factual issue, so that the litigation may proceed on the merits in either this court or the state forum.

## ORDER

AND NOW, to-wit, this 26th day of March, 1973, upon consideration of the Motion to Dismiss and opposing Affidavits, the Motion to Dismiss will be treated as one for Summary Judgment and for the reasons stated in this Memorandum, IT IS ORDERED that the Motion be denied, without prejudice to renewal after a hearing to resolve the disputed factual issue has been held."

Subsequent to the Court's Order, plaintiffs served on the defendants an interrogatory requesting the defendants to disclose any witness having knowledge of the conversations, discussions or negotiations relating in any way to the subject matter of Paragraph No. 18 of the Agreement. The defendants answered that the other parties having knowledge of any such conversations, discussions or negotiations were the defendants, Richard Zappala, Donald A. Kahan and Jake Jacobs. The depositions of Richard Zappala and Donald A. Kahan were duly filed with the Court. On September 10, 1973, the defendants filed their Motion for Summary Judgment supported by the sworn testimony of Richard A. Zappala at his deposition. In addition, an affidavit was filed by Richard Zappala.

■■■ We approach the duty of deciding the very interesting but difficult question posed by the motion within the confines of the law that a summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. This is the mandate of the Federal Rule of Civil Procedure 56(c). Furthermore, any doubt as to the existence of a genuine issue of fact must be resolved against the moving party, and documents filed in support of a motion for summary judgment are to be used to determine whether issues of fact exist and not in order to decide the fact issues themselves. United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197 (3rd Cir. 1973); Bowman Steel Corp. v. Lumbermens Mutual Casualty Co., 364 F.2d 246 (3rd Cir. 1966); Janek v. Celebrezze, 336 F.2d 828 (3rd Cir. 1964); Krieger v. Ownership Corporation, 270 F.2d 265 (3rd Cir. 1959). Furthermore, the burden of demonstrating the justification for the motion for summary judgment always lies with the movant. Adickes v. Kress & Co., 398 U.S. 144, 153–161, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1969). To state it another way, the Court is authorized to examine proferred materials extrane-

ous to the pleadings not for the purpose of trying an issue but to determine whether there is a genuine issue of material fact to be tried. If there is no such genuine issue of material fact, the parties are not entitled to a trial and the Court applying the law to the undisputed material facts may render summary judgment. See 6 Moore's Federal Practice, Par. 56.04 (1972 ed.).

As indicated in the above discussion, the complaint and the agreement disclosed that the defendants, real estate developers based in Pennsylvania, sold to the plaintiffs' assignee who was a citizen of Illinois, certain commercial real estate located in the State of New York. Thus, the transaction touched three states. In order to resolve any uncertainty as to which of the three states' laws would govern, or to avoid any uncertainty within a given foreign state as to the proper choice of law, the parties determined that the agreement should be interpreted under Pennsylvania law. Secondly, it prescribed clearly that any dispute was to be tried in Pennsylvania which was the defendants' domicile. Since Judge Weis' previous order declared that the agreement was patently ambiguous, the parties then went through the process of taking additional depositions for any light they might shed on the derivation of the phrase and the intent with which this phrase was used.

We deem it initially necessary to discuss briefly the law applicable to the interpretation of a phrase which is patently ambiguous. It is contended by the plaintiffs, for example, that when the agreement refers to "the Courts *of* the Commonwealth of Pennsylvania" that the word *"of"* may be used in a purely geographical sense as synonymous with "in" or "within". Defendants contend that the word has a political connotation referring to courts deriving their authority from the Sovereign Commonwealth of Pennsylvania. In this regard, the plaintiffs assert that there is no apparent reason why the defendants, having once been assured that suit would be brought in their home state (rather than in Illinois or New York) and that Pennsylvania law would be applied, would have had any interest in whether suit was brought in state or federal court within Pennsylvania.

We glean from the deposition of Richard Zappala that he acted as attorney for the defendants in this transaction, and his affidavit shows that the language of the forum selection clause was carried over *verbatim* from the language of a previous real estate purchase agreement between the principals. During the negotiations resulting in the previous agreement, Richard Zappala had informed Donald A. Kahan, attorney for the plaintiffs, that "Courts of the Commonwealth of Pennsylvania" meant the state courts and that Mr. Kahan voiced no objection to this construction of the forum selection language. Under these circumstances, even in the face of a patent ambiguity, the forum selection language is not to be strongly construed against the defendants because the initial draft of the agreement was prepared by defendants' counsel. There exists a well recognized exception to that rule where a contract is the result of the joint efforts of the attorneys or negotiators for both sides. Kaiser Aluminum & Chemical Corporation v. United States, 388 F.2d 317, 329, 181 Ct.Cl. 902 (1967); United States v. Continental Oil Company, 237 F.Supp. 294, 298 (W. D.Oklahoma 1964); Carter v. Certain-Teed Products Corp., 200 F.2d 754, 757 (8th Cir. 1953).

Under Section 230 of the Restatement of the Law of Contracts, it is stated as follows:

### STANDARD OF INTERPRETATION WHERE THERE IS INTEGRATION

"The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration

by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean."

Under Comments "a" and "b" to this section of the Restatement, if there is an ambiguity evidence may be received that a particular meaning is given to the language in a particular locality or by those engaged in a particular occupation, subject to the qualification that the viewpoint be the objective one of a third person. This objective third person is assumed to have knowledge of the operative usages as well as all other accompanying circumstances. "But oral statements by the parties of what they intended the written language to mean are excluded, though these statements might show the parties gave their words a meaning that would not be apparent. Such a common understanding may justify reformation, but cannot be the basis of interpretation of an integration." (Comment a.)

▇▇▇ The agreement in this case is an integrated agreement within the context of the Restatement of Contracts, Section 228, for it is there stated that "an agreement is integrated where the parties thereto adopt the writing or writings as the final and complete expression of the agreement. An integration is the writing or writings so adopted." Both Sections 228 and 230 of the Restatement of Contracts have been adopted as the law in Pennsylvania. In National Cash Reg. Co. v. Modern Transfer Co. Inc., 224 Pa.Super. 138, 302 A.2d 486 (1973), where the court was required to consider; (1) whether a party to a written contract could introduce parol evidence or prior oral representations inducing the party to enter into the contract but which would be inconsistent with or in addition to the written agreement? and, (2) whether a party may recover consequential damage for an alleged breach of performance under the contract where the parties expressly agreed to an exclusion of damage clause to their agreement?, the following appears at page 488:

"Parties sui juris are free to make their own contracts, which, in the absence of an allegation of fraud, accident, or mistake, will be interpreted and enforced as written, except as to unconscionable provisions. Peter J. Mascaro Co. v. Milonas, 401 Pa. 632, 166 A.2d 15 (1961); Insley v. State Mutual Life Assurance Co., 334 Pa. 368, 5 A.2d 544 (1939). Likewise, a court ordinarily cannot disregard a clause in a contract to which a reasonable meaning can be given. The general rule is that a court will make no inference or give any construction to the terms of a written contract that may be in conflict with the clearly expressed language of the written agreement. Spigelmire v. School District of Borough of North Braddock, 352 Pa. 504, 43 A.2d 229 (1945); General Finance Co. v. Pa. Threshermen & Farmers' Mutual Casualty Ins. Co., 348 Pa. 358, 35 A.2d 409 (1944). Thus, when the language is clear, there is no need for interpretation, and words cannot be added.

In the absence of ambiguity, a written contract is held to express all negotiations and agreements made prior to and leading up to its execution; that is, the negotiations are presumed to be merged in the writing, and oral testimony is inadmissible to explain or vary the writing. Waldman v. Shoemaker, 367 Pa. 587, 80 A.2d 776 (1951). This exclusionary rule has been referred to as the 'parol evidence rule'.

Appellant seeks to recover damages from appellee on the basis of oral representations allegedly made by appellee's sales agent prior to execution of the written computer lease agreement, but not contained therein. Despite the existence of an integration clause in the executed contract, appellant argues that existing case law permits us to consider extrinsic and parol evidence to justify its claim.

We believe that Judge Backenstoe ably stated the analysis of the case law and its applicability to the peculiar facts of the instant case:

'In deciding under what circumstances an oral agreement is superseded by a written one, "it is necessary to consider whether the parties situated as were the ones interested in the contract would naturally and normally include the one in the other. If they relate to the same subject matter and are so interrelated that both would naturally be executed at the same time and in the same contract, the scope of the oral agreement must be considered as covered by the writing." Henry On Evidence, Section 604, Page 31. The effect of the integration clause is to make the parol evidence rule "particularly applicable". Henry On Evidence, Section 591, Page 3, Note 3. Williston on Contracts, Section 811, Third Edition.

'In applying these principles to the instant case, we note that this is a contract apparently executed by senior officials of two active corporations. The defendant's officers, while perhaps not familiar with plaintiff's particular product, had direct experience in the computer field, having leased a computer from one of plaintiff's competitors. While the contract is a form lease, prepared by the plaintiff, there is a carefully drafted addendum to it which contains warranties and agreements dealing with most of the allegations contained in defendant's counterclaim. The addendum was signed by the defendant's president. We believe this addendum represents the final negotiations of the parties and supersedes any prior understandings.'

Our Supreme Court has upheld 'integration' or 'merger' clauses in contracts, and have refused to admit parol or prior written agreements where the language of the contract is clear and unambiguous. In Appeal of Edwin J. Schoettle Co., 390 Pa. 365, 372, 134 A.2d 908, 912 (1957), the Supreme Court said that while a court may take into consideration extrinsic circumstances in certain situations, it 'does not mean that where there is an integrated agreement—"where the parties thereto adopt a writing or writings as the final and complete expression of the agreement" (from Restatement of the Law of Contracts, § 228)—evidence of the negotiations which have led to the formation of this integrated agreement is admissible to show an intent at variance with the language of the written agreement . . .. The language of the instant agreement is clear and unambiguous. The buyer's evidence would tend to prove that in the negotiations leading up to the integrated agreement it was intended that the sellers warrant the company's and its subsidiaries' financial condition, whereas the language of the agreement plainly expresses a contrary intent. The admission of such evidence would vary and change the language of the agreement and its exclusion was eminently proper under the circumstances.' "

In the case of Wilkes-Barre Township School District v. Corgan, 403 Pa. 383, 170 A.2d 97 (1961), the Pennsylvania Supreme Court was called upon to interpret the terms of a deed, and stated the following (at page 99):

". . . . . Further, the standard of interpretation to be applied is the meaning that would be attached by a reasonably intelligent person, *acquainted with all operative usages, and knowing all the circumstances prior to and contemporaneous with the making of the contract*: Restatement, Contracts § 320 (obviously meaning § 230); Clearfield Development Corp. v. Devonian Co., 1956, 385 Pa. 248, 122 A.2d 718."

Following these rules of interpretation, we have looked to the contract, the affidavits and the depositions, not for the purpose of determining intent, and without consideration of any expressed intent of the parties in these depositions, but to determine whether or not there is contained therein any operative

usage or any circumstances which would affect the judgment of a reasonably intelligent person on the matter of interpretation. This is in accordance with the portion of Comment a, Section 230 of the Restatement of Contracts set forth above. Our examination has led us to no defined operative usage or circumstance which would aid us in the interpretation of the language that was used.

■ In light of this conclusion and upon very careful analysis of the disputed language and all circumstances surrounding the formation and execution of the agreement, we are of the opinion, and so hold, that the agreement is to be interpreted to mean that suit shall be brought only in courts of the Commonwealth of Pennsylvania and not in the federal court, although the latter has jurisdiction within the Commonwealth of Pennsylvania.

Our consideration of this case, however, cannot terminate at this point due to the fact that plaintiffs raised the additional question: Granting that the parties have made a reasonable selection of the place of suit, should a federal court give effect to a cause which purports to bar access to an otherwise available federal court at that place? Counsel for the plaintiffs claim that this is an issue of first impression and strongly urge that the question must be answered in the negative, for two reasons:

1. Any and all legitimate commercial interests of the defendants have been fully served by the institution of suit in the Federal Court for the Western District of Pennsylvania, since suit is now lodged at the defendants' home base and in a court which is bound to apply Pennsylvania law as bargained for. They thus claim that there is no conceivable legitimate commercial interest of the defendants which could be served by requiring the suit to be reinstituted in the Pennsylvania state court, and that such action would serve only to delay the ultimate disposition on the merits.

2. Counsel claims that to close the doors of this Court to the plaintiffs denies them a substantial federal constitutional and statutory right. It is claimed that since the plaintiffs are citizens of Illinois and the defendants are citizens of Pennsylvania that under Article 3 of the Constitution and Title 28 U.S.C. Section 1332, the plaintiffs have been given an absolute right to maintain a suit against the defendants in this court.

■ With respect to the first contention of the plaintiffs, we think it perfectly clear that the parties to the agreement have the right to determine whether or not there is a particular commercial interest which would be served by the institution of suit in a state court as related to suit in a federal court, and consequently that this can not be brushed aside solely on the contention that "there is no conceivable legitimate commercial interest of the defendant which could be served by requiring the suit to be reinstituted in the Pennsylvania state court". We agree with cases cited by counsel for the defendant that the court has discretion to decline jurisdiction where it is appropriate to give effect to parties' bargain. M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); Central Contracting Co. v. Maryland Casualty Co., 367 F.2d 341, 345 (3rd Cir. 1966); Geiger v. Keilani, 270 F.Supp. 761, 765 (E.D.Mich.1967). We hold, thus, that the interpretation of this contract and the appropriate forum to give effect to the parties' bargain is the state court of the Commonwealth of Pennsylvania.

We must then decide upon the plaintiffs' second contention that to close the doors of this Court is to deny them a substantial federal constitutional and statutory right. It is noted that Section 2 of Article 3 of the United States Constitution specifically extends the judicial power of the United States as vested "in the Supreme Court and in the inferior courts as established by Congress, to all

cases * * * between citizens of different states * * * ".

It is further provided under Section 1332 of Title 28 U.S.C.:

"(a) The district court shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—(1) citizens of different States; * * * "

There is no indication in the wording either of the Constitution or of Section 1332 that there is an absolute right to maintain a suit under the circumstances therein set forth. Counsel for the plaintiffs have failed to cite a single case in which this proposition has been sustained by an appellate court. Counsel argues that the situation of the plaintiffs here is, by reason of diversity, "a classic one for which the diversity jurisdiction was designed". That this is undoubtedly true does not answer the question, however, as to whether or not the bargain of the parties has not eliminated the federal courts as a place in which suit can be brought.

In the case of *M/S Bremen, supra,* certiorari was granted by the Supreme Court to review a judgment in the United States Court of Appeals for the Fifth Circuit declining to enforce a forum selection clause governing disputes arising under an international towage contract in which an American corporation contracted with a German corporation to tow the American corporation's drilling rig from Louisiana to a point off Ravenna, Italy. Zapata had solicited bids for the towage and several companies, including Unterweser, had responded. Unterweser was the low bidder and Zapata requested it to submit a contract which it did. The contract submitted by Unterweser contained a provision that:

"Any dispute arising must be treated before the London Court of Justice."

While the flotilla was in international waters, a severe storm arose and the rig was seriously damaged. Zapata, ignoring its promise to litigate "any dispute arising" in the English courts, commenced a suit in admiralty in the United States District Court seeking damages against Unterweser in personam, and the Tow Bremen in rem, alleging negligent towage and breach of contract. Unterweser invoked the forum clause and moved to dismiss for lack of jurisdiction or on forum non conveniens grounds, or in the alternative to stay the execution pending submission of the dispute to the "London Court of Justice". After several other matters were disposed of, the District Court finally denied Unterweser's motion to dismiss or stay Zapata's initial action. The District Court relied on the decision of Carbon Black Export v. The S S Monrosa, 254 F.2d 297 (5th Cir. 1958), appeal dismissed 359 U.S. 180, 79 S.Ct. 710, 3 L. Ed.2d 723 (1959). In that case the Court of Appeals had held a forum selection clause unenforceable, reiterating the traditional view of many American courts that "agreements in advance of controversy whose object is to oust the jurisdiction of the courts are contrary to public policy and will not be enforced". 254 F.2d at 300-301. The court then treated the motion to dismiss under normal forum non conveniens doctrine, and concluded that the balance of conveniences there was not strongly in favor of Unterweser, and Zapata's choice of forum should not, therefore, be disturbed. On appeal, the majority of the Circuit held that, following the *Carbon Black* decision, a forum selection clause "will not be enforced unless the selected state would provide a more convenient forum than the state in which suit is brought." The Court of Appeals affirmed the District Court using its discretion in refusing to decline jurisdiction on the basis of forum non conveniens. In the view of the Court of Appeals, enforcement of such clauses would be contrary to public policy under Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L. Ed. 911 (1955), and Dixilyn Drilling Corp. v. Crescent T. & S. Co., 371 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963),

but the District Court was entitled to consider that remanding Zapata to a foreign forum, with no practical contact with the controversy, could raise a bar to recovery by a United States citizen which its own convenient courts would not countenance. The Supreme Court, on appeal, in an opinion by Mr. Chief Justice Burger expressing the view of seven members of the court, held that the forum selection clause should be specifically enforced unless Zapata could clearly show that enforcement would be *unreasonable* or *unjust*, or that the clause was invalid for such reasons as fraud or overreaching; that there was nothing in the record which would support a refusal to enforce the forum selection clause; and that the clause provided for an exclusive forum and included even in rem actions. While the entire opinion in the Bremen case is of substantial importance here, we quote only those parts which we deem to be most pertinent, as follows:

"We hold, with the six dissenting members of the Court of Appeals, that far too little weight and effect was given to the forum clause in resolving this controversy. For at least two decades we have witnessed an expansion of overseas commercial activities by business enterprises based in the United States. The barrier of distance that once tended to confine a business concern to a modest territory no longer does so. Here we see an American company with special expertise contracting with a foreign company to tow a complex machine thousands of miles across seas and oceans. The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts. Absent a contract forum, the considerations relied on by the Court of Appeals would be persuasive reasons for holding an American forum convenient in the traditional sense, but in an era of expanding world trade and commerce, the absolute aspects of the doctrine of the Carbon Black case have little place and would be a heavy hand indeed on the future development of international commercial dealings by Americans. We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.

Forum-selection clauses have historically not been favored by American courts. Many courts, federal and state, have declined to enforce such clauses on the ground that they were 'contrary to public policy', or that their effect was to 'oust the jurisdiction' of the court. Although this view apparently still has considerable acceptance, other courts are tending to adopt a more hospitable attitude toward forum-selection clauses. This view, advanced in the well-reasoned dissenting opinion in the instant case, is that such clauses are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances. We believe this is the correct doctrine to be followed by federal district courts sitting in admiralty. It is merely the other side of the proposition recognized by this Court in National Equipment Rental, Ltd. v. Szukhent, 375 U.S. 311, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964), holding that in federal courts a party may validly consent to be sued in a jurisdiction where he cannot be found for service of process through contractual designation of an 'agent' for receipt of process in that jurisdiction. In so holding, the Court stated:

'[I]t is settled . . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether.' Id., at 315–316 [84 S. Ct. at 414], 11 L.Ed.2d at 358.

This approach is substantially that followed in other common-law countries including England. It is the view advanced by noted scholars and that adopted by the Restatement of the Conflict of Laws. It accords with ancient concepts of freedom of contract and reflects an

appreciation of the expanding horizons of American contractors who seek business in all parts of the world. (407 U.S. 11, 92 S.Ct. 1914, 32 L.Ed.2d 519–521)

\*  \*  \*  \*  \*  \*

The argument that such clauses are improper because they tend to 'oust' a court of jurisdiction is hardly more than a vestigal legal fiction. It appears to rest at core on historical judicial resistance to any attempt to reduce the power and business of a particular court and has little place in an era when all courts are overloaded and when businesses once essentially local now operate in world markets. It reflects something of a provincial attitude regarding the fairness of other tribunals. No one seriously contends in this case that the forum-selection clause 'ousted' the District Court of jurisdiction over Zapata's action. The threshold question is whether that court should have exercised its jurisdiction to do more than give effect to the legitimate expectations of the parties, manifested in their freely negotiated agreement, by specifically enforcing the forum clause.

There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect. In this case, for example, we are concerned with a far from routine transaction between companies of two different nations contemplating the tow of an extremely costly piece of equipment from Louisiana across the Gulf of Mexico and the Atlantic Ocean, through the Mediterranean Sea to its final destination in the Adriatic Sea. In the course of its voyage, it was to traverse the waters of many jurisdictions. The Chaparral could have been damaged at any point along the route, and there were countless possible ports of refuge. That the accident occurred in the Gulf of Mexico and the barge was towed to Tampa in an emergency were mere fortuities. It cannot be doubted for a moment that the parties sought to provide for a neutral forum for the resolution of any disputes arising during the tow. Manifestly much uncertainty and possibly great inconvenience to both parties could arise if a suit could be maintained in any jurisdiction in which an accident might occur or if jurisdiction were left to any place where the Bremen or Unterweser might happen to be found. The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting. There is strong evidence that the forum clause was a vital part of the agreement, and it would be unrealistic to think that the parties did not conduct their negotiations, including fixing the monetary terms, with the consequences of the forum clause figuring prominently in their calculations. Under these circumstances, as Justice Karminski reasoned in sustaining jurisdiction over Zapata in the High Court of Justice, 'the force of an agreement for litigation in this country, freely entered into between two competent parties, seems to me to be very powerful.'

Thus, in the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside." (407 U.S. 15, 92 S.Ct. 1916, 32 L.Ed.2d 521–523)

\*  \*  \*  \*  \*  \*

Courts have also suggested that a forum clause, even though it is freely bargained for and contravenes no important public policy of the forum, may nevertheless be 'unreasonable' and unenforceable if the chosen forum is *seriously* inconvenient for the trial of the action. Of course, where it can be said with reasonable assurance that at the time they entered the contract, the parties to a freely negotiated private international commercial agreement contemplated the claimed inconvenience, it is difficult to see why any such claim of inconvenience should be heard to render the forum clause unenforceable. We are not here dealing with an agreement between two

Americans to resolve their essentially local disputes in a remote alien forum. In such a case, the serious inconvenience of the contractual forum to one or both of the parties might carry greater weight in determining the reasonableness of the forum clause. The remoteness of the forum might suggest that the agreement was an adhesive one, or that the parties did not have the particular controversy in mind when they made their agreement, yet even there the party claiming should bear a heavy burden of proof. Similarly, selection of a remote forum to apply differing foreign law to an essentially American controversy might contravene an important public policy of the forum. For example, so long as Bisso governs American courts with respect to the towage business in American waters, it would quite arguably be improper to permit an American tower to avoid that policy by providing a foreign forum for resolution of his disputes with an American towee.

This case, however, involves a freely negotiated international commercial transaction between a German and an American corporation for towage of a vessel from the Gulf of Mexico to the Adriatic Sea. As noted, selection of a London forum was clearly a reasonable effort to bring vital certainty to this international transaction and to provide a neutral forum experienced and capable in the resolution of admiralty litigation. Whatever 'inconvenience' Zapata would suffer by being forced to litigate in the contractual forum as it agreed to do was clearly foreseeable at the time of contracting. In such circumstances it should be incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. Absent that there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain." (407 U.S. 17, 92 S.Ct. 1917, 32 L.Ed.2d 524–525)

We are perfectly aware that this Supreme Court decision came only in the context of choice of forum between one in this country and one in England. However, there is no reason that the broad principles announced in that decision would not be applicable to the instant situation. There is support for this interpretation of the Bremen decision in the case of In-Flight Devices Corporation v. Van Dusen Air, Inc., 466 F.2d 220 (6th Cir. 1972) where there was an action for breach of contract and for damages for injuries to a business reputation. There a Minnesota corporation entered into contract negotiations involving a substantial order for manufacture of goods with a firm which it knew was based in Ohio and where its production facilities were located. An Ohio "long-arm" statute was held to apply to a personal jurisdiction over the corporation in an action of tort based on a claim of the Ohio corporation for damage to business reputation because of the act of the Minnesota corporation in stopping payment on the check issued to satisfy outstanding obligations under the purchase contract. In the District Court, Van Dusen moved to dismiss the action on the ground that the court lacked jurisdiction. After considering affidavits and briefs filed by the parties, the District Court granted the defendant's motion and dismissed the case. On appeal, the judgment of the District Court was reversed on the basis that in enacting its "long-arm" statute the Ohio legislature intended to extend the jurisdiction of its courts to the constitutional limits with respect to the section dealing with the transaction of any business in the state. In connection with this opinion, the court made the following statement (pages 233–234):

"One factor which has been identified as making the assertion of jurisdiction over a non-resident unfair in a given case is the sense of surprise—the disappointment of expectation—which may result from the use of

long-arm jurisdiction. A purchaser who engages in an essentially one state operation—and occasionally buys an item or two out of state, for instance, is far more likely to be unprepared to deal with out of state litigation than an individual or corporation whose business frequently involves him or it in interstate transactions. The existence of substantial interstate business in general cannot substitute for some direct contacts with the forum state under the first test of *Southern Machine* [Southern Machine Co. v. Mohasco Industries, Inc., 401 F.2d 374 (6th Cir.)] of course, but where such direct contact consists primarily of the entering of a contract with a resident of the forum state by the non-resident defendant the general interstate involvement of the defendant is suggestive of the latter's expectation that it may be involved in litigation far from its home base. Here, the parent Van Dusen Corporation's in-house operations are spread across state lines with its headquarters in Minnesota and its purchasing operations centered in Missouri. Its dealings with its subsidiaries alone—treating such subsidiaries as the independent entities Van Dusen asserts them to be involve dealings with corporate 'residents' of states spread across the country. It can hardly surprise Van Dusen or disappoint its general expectations that it is called upon to defend in a forum far from its home base(s)."

And the Court then makes the following statement by way of footnote (Page 234, Footnote 24):

"A party in Van Dusen's position desiring to eliminate the possibility of out of state litigation could do so by avoiding any contractual relationship with an out of state resident, of course. A more practical alternative however might be to stipulate in the contract the forum of choice. In recent years most courts have given effect to such stipulations where the forum chosen is reasonable and the contract involved is not one of adhesion. See, for example, Central Contracting Co. v. Maryland Casualty Co., 367 F. 341 (3d Cir. 1966); but see Indussa Corp. v. S. S. Ranborg, 377 F.2d 200 (2d Cir. 1967). This year it would seem that the Supreme Court gave conclusive sanction to the practice of accepting such stipulations as binding in appropriate circumstances. M/S Bremen and Unterweser, reederei, GMBH v. Zapata Off-Shore Company, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513, decided June 12, 1972. Although the Supreme Court decision came in the context of a choice between a forum in this country and one in England, the principles announced in it would seem equally applicable to domestic choice of forum questions."

Furthermore, we believe our conclusion that the motion for summary judgment must be granted to be consistent with the opinion of the Third Circuit Court of Appeals in the case of Central Contracting Co. v. Maryland Casualty Co., 367 F.2d 341 (1966), in which the court affirmed the opinion of Chief Judge Rabe F. Marsh, Jr. of this Court. In that opinion it was held that that provision of the subcontract on a Pennsylvania public project, that any suit against the general contractor or surety should be maintained in New York, was not unreasonable, and justified Pennsylvania District Court's declining jurisdiction of the action against the surety, in view, inter alia, of the general contractors' relations with New York, provision that New York law should govern, and provision for arbitration in New York. It is noted further that in this case the defendant moved to dismiss the action under Rule 12(b)(6) on the ground that the complaint failed to state a claim upon which relief could be granted. The appellate court concluded that the motion to dismiss should have been treated as one for summary judgment under Rule 56, and so considered it. The

Court stated as follows (at Page 344–345):

"The validity of Section 45 of the subcontractor's contract recently was reviewed by the Supreme Court of Pennsylvania in the action by this plaintiff against the general contractors. The court there reviewed the earlier Pennsylvania decisions and announced the modern rule which is to prevail in Pennsylvania. 'The modern and correct rule is that, while private parties may not by contract prevent a court from asserting its jurisdiction or change the rules of venue, nevertheless, a court in which venue is proper and which has jurisdiction should decline to proceed with the cause when the parties have freely agreed that litigation shall be conducted in another forum and where such agreement is not unreasonable at the time of litigation.' Central Contracting Co. v. C. E. Youngdahl & Co., Inc., 418 Pa. 122, 133, 209 A.2d 810, 816 (1965). The court then went on to consider the elements which are relevant in determining the unreasonableness of such a provision. 'Such an agreement is unreasonable only where its enforcement would, under all circumstances existing at the time of litigation, seriously impair plaintiff's ability to pursue his cause of action. Mere inconvenience or additional expense is not the test of unreasonableness since it may be assumed that the plaintiff received under the contract consideration for these things. If the agreed upon forum is available to plaintiff and said forum can do substantial justice to the cause of action then plaintiff should be bound by his agreement.' 418 Pa. at 133–134, 209 A.2d at 816.

We need not consider whether in this diversity case we are bound to apply the Pennsylvania rule, for both federal and state courts have increasingly in recent years recognized the same principle which the Supreme Court of Pennsylvania has now adopted. It is becoming more widely recognized that for reasons of business or convenience the parties may have bargained that all litigation arising out of their complex activity under a contract shall be drawn into one jurisdiction. So long as there is nothing unreasonable in such a provision there is no basis for viewing it as an affront to the judicial power, which must be stricken down. On the contrary, it should be respected as the responsible expression of the intention of the parties so long as there is no proof that its provisions will put one of the parties to an unreasonable disadvantage and thereby subvert the interests of justice.

The Pennsylvania rule, therefore, represents the correct principle, and we accept it and apply it here. This brings us to the question whether the provision that the action must be brought only in the courts of New York County is unreasonable.

On the face of it there is no unreasonableness in the provision. Two of the three general contractors were New York corporations. The provision is tied in with the requirement that the rights of the parties should be construed pursuant to the laws of the State of New York and that disputes should be arbitrated in the City of New York subject to the judicial supervision and review of the Supreme Court of New York and the appellate courts of that state. Judge Marsh in the court below noted that the forum in New York is only 400 miles from plaintiff's home office and that this would hardly impose an unreasonable burden upon it. Affidavits by the parties present some fragmentary information on the subject but they are not enough to rise to the dignity of substantial evidence of unreasonableness. Under Pennsylvania law the burden is on the plaintiff to prove the unreasonableness of the provision.

Central Contracting Co. v. C. E. Youngdahl & Co., Inc., *supra,* at 134, 209 A.2d at 816. Even if the Pennsylvania requirement as to the burden of proof is not binding upon us in a diversity case we are satisfied that this is the correct rule. Since the plaintiff had the burden of showing that the provision is unreasonable, the lack of proof is fatal to its claim. We may also add that the construction of the agreement and the arbitration provisions which still surround the litigation must be decided according to the law of New York and that its courts are the most appropriate instruments to carry out this function.

We are mindful that cases may be imagined in which the requirement of a contract limiting resort to a single forum may be the instrument of injustice. But such a provision does not oust the jurisdiction of the courts; in effect it merely constitutes a stipulation in which the parties join in asking the court to give effect to their agreement by declining to exercise its jurisdiction. There will always be open to either party the opportunity to present whatever evidence will move a court in the particular circumstances not to decline to exercise its undoubted jurisdiction. No such showing has been made in the present case."

It is, therefore, our considered opinion that the defendants' motion for summary judgment must be granted. The plaintiffs in this case do not even argue with any degree of force that trial in the contractural forum is either gravely difficult or inconvenient so that for all practical purposes they would be deprived of their day in court. There is nothing in the record, therefore, which forms any basis for a conclusion that our holding would be unfair, unjust, or unreasonable by enforcing the terms of the contract.

An appropriate order will be entered.