[Civ. No. 28765.   Second Dist., Div. One.   Feb. 16, 1966.]

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, Plaintiff and Respondent, v. SEYMOUR Z. FROMBERG, Defendant and Appellant.

186

Sheldon Lipton and Edward L. Lascher for Defendant and Appellant.

Adams, Duque & Hazeltine, John H. Brinsley and David M. Bosko for Plaintiff and Respondent.

LILLIE, J.—Plaintiff sought and secured a declaratory judgment that upon termination of defendant's employment as plaintiff's agent it was entitled to retain certain sums advanced to defendant under two salary plans referred to in the pleadings as Incentive Salary Plan and Potential Commission Advance Plan respectively. The present appeal is from such judgment, the principal contention being that recovery may not be had under either of the above plans since they violate section 221 of the Labor Code making it "unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."

The background facts are without dispute. On or about December 12, 1955, defendant became employed under the Incentive Salary Plan (referred to hereinafter as ISP) pursuant to the terms of a written contract entitled "Full Time Special Agent's Career Contract," and another written contract supplemental thereto executed the same day. The second (or supplemental) agreement provided that defendant would be compensated under plaintiff's ISP, the provisions of which are set forth in a booklet and administrative manual which were incorporated into the supplemental agreement by reference, both the booklet and manual were handed to defendant when he executed the contract. Three years later, on or about December 8, 1958, the supplemental agreement was terminated, as therein provided, by written notice from plaintiff. Thereafter, as further agreed by the parties, defendant became compensated under plaintiff's Potential Commission Advance Plan, this latter plan being subsequently described in plaintiff's letter to defendant dated February 2, 1959. All of the above documents were received in evidence without objection.

During defendant's employment under each of the above plans, and pursuant to their terms, plaintiff regularly advanced certain sums of money to defendant. When, on April 27, 1962, defendant terminated his employment, plaintiff contended that it was entitled to withhold from defendant commissions otherwise due him to offset the indebtedness to plaintiff (the amount of which is not in controversy) arising from the advances he had received under each of the two plans. Defendant contended otherwise, thus precipitating the present litigation.

Basically, ISP operated as follows:[1] In order to equalize defendant's weekly take-home pay, he received a regular draw or advance which was based upon his salary credits and charged against his actual credits.[2] In the event the amount of the advances exceeded his commissions, his salary account balance would show a deficit; however, if these advances were less than his commission, this balance would be positive. Each week defendant was required to complete a progress report which showed the work he had done and the insurance business (if any) produced during the previous week. (Two such reports were introduced into evidence; although they establish that production results were nil, defendant nevertheless received a weekly advance of $150—if his employment had been on a straight commission basis, defendant would have received nothing.) Plaintiff, in turn, furnished defendant with a weekly "Compensation Statement" showing the latter's salary account balance, net potential commissions and advances. (Many of these statements, commencing with the first week of defendant's employment, reflected negative balances.)

Under both plans it was provided that any indebtedness resulting from the operation thereof would be a prior lien on any commission owing and payable to the agent upon termination of his service with the company.

There was evidence that defendant had worked for two other insurance companies before his affiliation with plaintiff

---

[1] With certain minor variations, the Potential Commission Advance Plan functioned under the same terms or conditions.

[2] An example of "salary credit" is furnished by respondent: ". . . if appellant sold a policy which required monthly payments of $10.00, he received an immediate salary credit based upon the full first year's potential commission upon the sum of $120.00. He also received a training support credit of 30% of this potential commission. His regular weekly draws were charged against these salary credits. If a policy providing for monthly premiums lapsed before all of the premiums for the first year were paid, appellant's account was then charged a proportionate amount of the first year commission that had not actually been earned."

and prior thereto had studied accounting in college; the court accordingly found that he was fully capable of understanding the terms and provisions of the various documents in suit and had consented to the numerous employment provisions therein set forth.

In addition to his main point, that the contract is unenforceable by reason of its asserted illegality, defendant now complains that the terms of the agreement are indefinite and unintelligible and that the court erred in excluding parol evidence as to the meaning of certain provisions; in that connection it was argued below that testimony should have been received with respect to defendant's understanding of the plan. There is certainly no merit to the claim last mentioned (*Williams* v. *United California Bank*, 223 Cal.App.2d 309, 315 [35 Cal.Rptr. 788]), nor do we share defendant's view that the documents as a whole are not free from ambiguity. All of such documents were received in evidence without objection; all of them related to the same subject matter. It is the rule that when written instruments all relate to one single transaction, they should be construed together. (*Kaneko* v. *Okuda*, 195 Cal.App.2d 217, 231 [15 Cal.Rptr. 792].) Furthermore, defendant apparently had no difficulty in understanding his rights under the contract, at least before any controversy arose. In August of 1960, after leaving the Incentive Salary Plan, defendant was asked to specify an amount, to be paid weekly, to offset his ISP indebtedness; to this request he submitted a letter proposing to repay $5.00 each month. It should be borne in mind that defendant was hardly a novice in the field of insurance sales when he entered upon his employment with plaintiff.

Accordingly, "When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent." (*Crestview Cemetery Assn.* v. *Dieden*, 54 Cal.2d 744, 754 [8 Cal.Rptr. 427, 356 P.2d 171].)

While defendant also asserts that the evidence was insufficient to support the findings, he contents himself with a mere assertion in that regard without a fair statement of all the evidence bearing upon the claim. A reviewing court is not required to make an independent search of the record to uncover error; accordingly, the instant assignment is entitled to no consideration whatsoever. (*Bongiovanni* v. *Rackow*, 212 Cal.App.2d 550, 552 [28 Cal.Rptr. 155].)

We come now to defendant's major ground for reversal.

Although there is no mention thereof in his opening brief, in his reply to plaintiff's brief defendant concedes the point therein made that the question of illegality was not raised below; he does not, of course, concede plaintiff's further point (extensively argued) that such claimed defense may not be initially urged on appeal. Defendant relies on the apparent exception to the general rule invoked by plaintiff, namely, that "Whatever the state of the pleadings, when the evidence shows that the plaintiff in substance seeks to enforce an illegal contract . . . the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids. [Citations.] It is immaterial that the parties, whether by inadvertence or consent, even at the trial do not raise the issue." (*Lewis & Queen* v. *N. M. Ball Sons*, 48 Cal.2d 141, 147-148 [308 P.2d 713].) The principle inherent in the above exception does not, however, seem to be an inflexible one. █ Thus, while it is undoubtedly the public policy of this state that workers' wages are accorded a special status and to that end are protected by numerous statutes regulating their payment, assignment and exemption (*Kerr's Catering Service* v. *Department of Industrial Relations*, 57 Cal.2d 319, 325 [19 Cal.Rptr. 492, 369 P.2d 20]), and while (to the same end) it is made a crime for an employer to collect or receive any previously paid wages (Lab. Code, § 225), "how the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved." (*Lewis & Queen* v. *N. M. Ball Sons, supra*, p. 151.) It is noteworthy, therefore, that decisions subsequent to *Lewis & Queen* have refused to apply the exception in cases where the defense of illegality was raised for the first time on appeal: *Apra* v. *Aureguy*, 55 Cal.2d 827 [13 Cal.Rptr. 177, 361 P.2d 897] (usury); *Fomco, Inc.* v. *Joe Maggio, Inc.*, 55 Cal.2d 162 [10 Cal.Rptr. 462, 358 P.2d 918] (violation of licensing statute); *Kassianov* v. *Raissis*, 200 Cal.App.2d 573 [19 Cal.Rptr. 614] (violation of Welfare and Institutions Code).

█ Defendant also refers to another statement of the exception relied on, to-wit, that " 'a party to an illegal contract cannot come into a court of law and . . . set up a case in which he must necessarily disclose an illegal purpose as the groundwork of his claim.' " (*Lee On* v. *Long*, 37 Cal.2d 499, 502 [234 P.2d 9].) According to defendant, the burden of proof lay with plaintiff and not with him, and "he was

free to wait and see what Prudential would attempt to prove before any obligation arose to open his mouth at all.'' But the above considerations must be examined in light of the recognized trial policy of narrowing the issues in dispute ''which normally confines the court to those made by the pleadings, . . . To this end, the trial court must be free to search out illegality lying behind the forms in which the parties have cast the transaction to conceal such illegality.'' (*Lewis & Queen* v. *N. M. Ball Sons, supra*, p. 148.) In the instant case, it is necessary to point out, the trial court was accorded no such freedom.

But even if its attention had been directed to the defense now raised, there is persuasive authority militating against the present claim of illegality. The several plans here in suit did not involve secret deductions or kick-back schemes which were denounced in the *Kerr's Catering* decision. There, as shown by the court, ''. . . it was the utilization of secret deductions or 'kick-backs' to make it appear that an employer paid the wage provided by a collective bargaining contract or by a statute, although in fact he paid less, that led to the enactment of Labor Code sections 221-223 in 1937.'' (57 Cal.2d 319, 328.) In our case, on the other hand, the employment contract is one curtailing defendant's right to recover commissions after the termination of his employment. Such contracts have been upheld in California (*Merrill* v. *Continental Assur. Co.*, 200 Cal.App.2d 663 [19 Cal.Rptr. 432]; *Barker* v. *Sherman*, 123 Cal.App.2d 810 [267 P.2d 863]), in Indiana,[3] Missouri,[4] Pennsylvania,[5] and other jurisdictions. As pointed out by the Pennsylvania Supreme Court in the *Insley* case, provisions similar to those at bar are mutually advantageous: ''There is certainly nothing unconscionable or unreasonable in the contract provision appellee invokes. Common business prudence dictates that an insurance company should by apt provisions in its contracts with its agents make it financially worthwhile for such agents to continue their allegiance to the company. After its agent has secured a purchaser for one of the company's policies and received about half of the first year's premium for doing so, the company's interest requires that the insured continue to pay the premiums on that

[3]*Andrews* v. *Public Savings Ins. Co. of America*, 80 Ind. App. 537 [141 N.E. 646].

[4]*Christensen* v. *Prudential Ins. Co. of America*, (Mo. App.) 204 S.W.2d 459.

[5]*Insley* v. *State Mut. Life Assur. Co.*, 334 Pa. 368 [5 A.2d 544].

policy. Inasmuch as many insured persons have a tendency to permit their policies to lapse, sometimes being induced to do this by agents of competing companies, the company must rely on its agent to keep his contacts with the insurance patron he secured and encourage him to maintain the relationship he induced him to enter into. For so doing, the agent is rewarded with a percentage of the renewal premiums. When his financial interest in the payment of these renewal premiums ends, his value to the company *pro tanto* ends. When the company refuses payment of a part of the renewal premiums, which part he has already sold for cash, the company is not penalizing him; it is denying him something he has neither a legal nor a moral claim to.'' (5 A.2d at p. 548.)

Furthermore, the statute which the subject contract assertedly offends must be read with its companion statutes, and section 224 of the Labor Code provides in pertinent part that ''The provisions of Sections 221, 222 and 223 shall in no way make it unlawful for an employer to withhold or divert any portion of the employee's wages . . . when a deduction is expressly authorized in writing by the employee to cover . . . deductions not amounting to a rebate or deduction from the standard wage arrived at . . . pursuant to wage agreement . . . .'' In the present case the standard wage was not arrived at on a straight commission basis; rather, defendant's compensation remained subject to all the contingencies set forth in the parties' agreement. These included plaintiff's right to withhold future commissions as offsets against its indebtedness, whether such indebtedness be considered as arising from loans to defendant to be repaid by him at the termination of his agreement (*Theriault* v. *E. L. King & Co.*, 282 Mass. 109 [184 N.E. 386]), or, as Williston has said, because ''commissions upon renewal premiums are not simply payment for securing the insurance but compensation for other services in the prosecution and preservation of the company's business; and, accordingly, if the agent is discharged for cause, or leaves voluntarily, the company is under no further liability in respect to the renewal premiums.'' (Contracts (Rev. ed.) § 1030.)

Plaintiff had no opportunity to present to the trial court the several elements and concepts just mentioned which negative defendant's claim that the subject contract on its face is violative of the subject statute. Otherwise, as stated in *Kassianov* v. *Raissis, supra*, 200 Cal.App.2d 573, 578, ''All of

these factors, and perhaps others, would have been weighed by the trial court, together with its construction of the statute, had the subject of illegality been raised." Accordingly, we feel that the circumstances of the present case do not, as urged by defendant, bring it within the exception to the general rule governing appellate review of questions not urged below. The rule is an eminently fair one based upon sound principles of fundamental fairness and designed to prohibit a party from repudiating on appeal the theory presented by his pleadings and evidence.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied March 14, 1966.