[No. B172415. Second Dist., Div. Eight. Feb. 7, 2005.]

KURT STEINHEBEL et al., Plaintiffs and Appellants, v.
LOS ANGELES TIMES COMMUNICATIONS, LLC, Defendant and
Respondent.

**COUNSEL**

Thierman Law Firm, Mark R. Thierman, Micheline N. Fairbank; Hoffman & Lazear, H. Tim Hoffman, Arthur Lazear; Law Offices of Eric M. Epstein and Eric M. Epstein for Plaintiffs and Appellants.

Seyfarth Shaw, Kenneth D. Sulzer and Thomas R. Kaufman for Defendant and Respondent.

## OPINION

**FLIER, J.**—Appellants, Kurt Steinhebel et al., former "telesales" employees of respondent Los Angeles Times Communications LLC, appeal from a summary judgment issued on the ground it was lawful for respondent to contract with such employees to pay a commission upon the sale of a subscription immediately, subject to a charge-back if the customer did not keep the subscription for at least 28 days.

After reviewing pertinent law, we conclude that respondent's charge-back policy does not violate the Labor Code and thus is lawful.[1] We accordingly affirm the judgment of the trial court.

### FACTS[2]

Respondent is the publisher of Los Angeles's leading local newspaper. Each of the appellants worked for respondent as a telesales employee. Telesales employees telephoned prospective customers to sell them newspaper subscriptions. They also telephoned existing customers with limited subscriptions to attempt to convert their subscriptions into broader ones. The type of subscriptions sold by respondent's telesales employees enlarged over time, and the list ultimately included: (1) a daily subscription, (2) a daily subscription plus a Sunday subscription, (3) a Sunday-only subscription and (4) a "Weekender" (Saturday and Sunday) subscription. Different values were ascribed to each type of subscription sold to calculate a telesales employee's productivity and level of commission. The employee received additional commissions for sales by credit card.

Each of the appellants read and signed substantially similar versions of the Los Angeles Times Telesales Agreement (Agreement), discussed more fully below, when they began their employment, and respondent provided each with a copy of the Agreement. Respondent required each telesales employee to sign an acknowledgment confirming he or she understood the Agreement and agreed with its terms before making any sales. With the exception of commission rates and productivity calculations not material to this case, the provisions governing payment of commissions in the Agreement remained unchanged during appellants' employment.

---

[1] All section references are to the Labor Code unless otherwise noted.

[2] Respondent has moved to strike those portions of appellants' opening brief referring to facts not contained within the stipulated factual record on appeal. Alternatively, respondent requests that we disregard the passages of the opening brief referring to evidence not contained in the record. We will disregard matters not supported by the record (*Kelsey v. Waste Management of Alameda County* (1999) 76 Cal.App.4th 590, 599, fn. 5 [90 Cal.Rptr.2d 510]) and otherwise deny the motion to strike.

Appellants were trained on how they should perform their jobs and received a copy of respondent's Telesales Training Manual (Training Manual). The Training Manual explained respondent's compensation policies and practices and how telesales employees were to be compensated. Each telesales employee earned an hourly base pay at the statutory minimum wage. In addition to the hourly minimum wage, telesales employees received a commission payout for each verified sale they made. It was stipulated that each telesales employee received his or her full hourly wage regardless of his or her net level of sales during a given pay period.

Under the Agreement, appellants received a commission only on "commissionable orders," defined as "a sale that is input into the L.A. Times home delivery computer . . . where the customer keeps the paper for a minimum of 28 days without giving a specific stop date." Such an order may be placed for either "a customer who is inactive in the system" or "a Sunday customer who is being converted to a Daily/Sunday order or Daily Only order."

The Agreement also defined what was *not* a commissionable order: (1) an order with a specific stop date (term order); (2) a misrepresented order; (3) an order placed with a customer currently active in respondent's delivery system; and (4) "*a charged[-]back order (when a customer does not keep the paper for at least 28 days)*." (Italics added.)

Under respondent's policies, each time a telesales employee made a sale, the sale was subject to verification. Another employee, called a "verifier," would call the customer to ensure certain prerequisites were met before a sale could qualify for a commission payout. Specifically, the verifier ascertained whether the customer really wanted the subscription, whether the customer already had delivery of the same product and whether respondent had previous collection problems with the customer.

Respondent retained discretion to terminate or rescind a sale (an "in[-]house kill") prior to commencing delivery of the paper. In cases of an in-house kill, no sale was attributed to the telesales employee, no subscription was ever delivered to the customer and no commission was ever paid to the telesales employee for the sale.[3]

If the verifier verified the sale, respondent would pay out a commission to the telesales employee according to the terms of the Agreement.

The Agreement, signed by each telesales employee, provides: "Even though an order is not commissionable until the customer keeps it 28 days,

---

[3] The parties stipulated these in-house kills are not charge-backs for purposes of the summary judgment motion, and they are not at issue here.

The Times will pay you two weeks in advance for the order. Beginning on the second pay period after your start date, you will receive an advance against your commissions. The amount will be equal to the commissions attributable to the preceding pay period. However, if the subscription is rejected by The Times [an "in-house kill"] or by the customer before 28 days, the amount advanced in respect to the rejected subscription will be deducted from your compensation payable subsequent to the date of such rejection based on your commission rate for [the] current week and *you hereby authorize* such deductions." (Italics added.)

Respondent paid out commissions to a telesales employee based on his or her net sales for the week. To arrive at the net sales figure for any given week, respondent started with the employee's gross number of sales for the week and subtracted from that the number of subscriptions canceled during that week which had not been held long enough to qualify as commissionable orders. If the net amount for the week fell below zero, the commission total for the week would be deemed to be zero and any negative amount carried over into the following week.

The Training Manual advised employees that "[t]elesales representatives work a 30-hour shift weekly. Each representative should make 1 Everyday sale an hour. This represents 30 Everyday sales a week." The manual further advised the employee that "[d]ue to charge-backs it is recommended that you try and get two extra sales a day. Remember[,] the customer may change their mind and stop the paper." (Boldface omitted.)

Telesales employees were only charged back for their own noncommissionable orders.

### PROCEDURAL HISTORY

Appellants filed a complaint seeking relief under sections 203 (waiting time penalties), 221 (collection or receipt of wages previously paid), 223 (secret payment of wage lower than designated scale), 225 (unlawful receipt or withholding of wages and secret payment of wage below scale) and 400 through 410 (restrictions on employee bonds, "the Employee's Bond Law") and Business and Professions Code section 17200 (unfair competition). Appellants sought relief on their own behalf and on behalf of a class of inside telephone sales representatives, telemarketers, associates and other inside sales personnel employed by respondent in California who were or are subject to charge-backs against future commissions. The complaint alleged three causes of action seeking compensation for allegedly illegal commission charge-backs (first cause of action), waiting time penalties (second cause of action) and an injunction and monetary relief for unfair competition (third cause of action).

Respondent moved for summary judgment or, alternatively, summary adjudication of issues. Respondent asserted the first cause of action fails because respondent's commission advance/charge-back policy is lawful and the second and third causes of action also fail because they are derivative of the first cause of action. Appellants opposed the motion.

The parties jointly submitted a set of stipulated facts to the trial court as set forth above for use in the summary judgment motion. (See, e.g., *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 443 [97 Cal.Rptr.2d 179, 2 P.3d 27].)

Based on that submission, the trial court orally granted respondent's motion for summary judgment at a hearing on September 16, 2003. The court ruled on the first cause of action that, although commissions were earned at the time work was complete, the commissions were subject to a 28-day condition precedent and that the second and third causes of action also failed because they were derivative of the first cause of action.

The trial court issued a written order granting respondent's motion for summary judgment on October 23, 2003. The court determined that appellants' first cause of action failed because respondent's charge-back policy is lawful under California's wage and hour laws, namely, sections 221, 223, 225 and 400 through 410. The court found cases such as *Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319 [19 Cal.Rptr. 492, 369 P.2d 20] (*Kerr's*), *Quillian v. Lion Oil Company* (1979) 96 Cal.App.3d 156 [157 Cal.Rptr. 740] (*Quillian*), and *Hudgins v. Neiman Marcus Group, Inc.* (1995) 34 Cal.App.4th 1109 [41 Cal.Rptr.2d 46] (*Hudgins*), on which appellants relied, did not support a rule barring charge-backs against commission advances. The court stated those cases addressed different legal issues, such as the prohibition against employers holding employees personally financially responsible for cash shortage, breakage or loss of equipment, that were not implicated by respondent's charge-back policy.

The court ruled it was lawful for respondent to condition payment of a commission on the customer maintaining a subscription for 28 days without canceling. The court also ruled it was legal for respondent to advance a commission to its telesales employees immediately upon the sale of the subscription, subject to a charge-back if the customer canceled before the 28-day holding period was satisfied.

The court further ruled that appellants' second cause of action for waiting time penalties under section 203 and third cause of action for unfair business practices under Business and Professions Code section 17200 et seq., also

failed because each is derivative of the first cause of action and appellants had agreed at the hearing that those causes of action would fail if the first cause of action failed.

The court entered a judgment in respondent's favor on October 23, 2003. Appellants timely appealed from the judgment.

## STANDARD OF REVIEW

Because the issues were presented on stipulated facts, the trial court ruled solely on questions of law. Accordingly, we review the matter de novo on appeal. (*Carroll v. County of Los Angeles* (1997) 60 Cal.App.4th 606, 608 [70 Cal.Rptr.2d 504]; *Sea World, Inc. v. County of San Diego* (1994) 27 Cal.App.4th 1390, 1397 [33 Cal.Rptr.2d 194].)

## DISCUSSION

In the present case, we are presented with the issue whether an employer may advance commissions to its employees and then by agreement charge back any excess of advances over commissions earned against future advances. As we discuss below, we hold an employer may legally advance commissions to its employees prior to the completion of all conditions for payment and, by agreement, charge back any excess advance over commissions earned against any future advance should the conditions not be satisfied.

1. *A Charge-back of Advanced Commission Against Future Advances Does Not Violate Labor Code Section 221*

Appellants contend that respondent's charge-back of commission advances against their future advances on commission is a violation of section 221. We disagree.

Section 221 provides that "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Section 200, subdivision (a) defines "wages" to include "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, *commission basis*, or other method of calculation." (Italics added; see *Reid v. Overland Machined Products* (1961) 55 Cal.2d 203, 207–208 [10 Cal.Rptr. 819, 359 P.2d 251] (*Reid*) [commissions are wages].) Section 200, subdivision (b) defines "labor" to include "labor, work, or service whether rendered or performed under contract, subcontract, partnership, station plan, or other agreement if the labor to be paid for is performed personally by the person demanding payment."

While *Reid* makes clear that commissions are "wages," even under *Reid* contractual terms must be met before an employee is entitled to a commission. (*Reid, supra,* 55 Cal.2d at pp. 209–210 [trial court erred in excluding evidence that employment agreement provided commission only upon gross business invoiced during employment].)

In the present case, under the stipulated facts, appellants' commission was contingent upon two general conditions: (1) the sale had to be a "verified" sale, i.e., the customer confirmed he or she really wanted the subscription, the customer was not already taking delivery of the product purportedly sold by the salesperson and there was no prior collection problem with the customer; and (2) the customer had to keep the subscription for at least 28 days. Unless both conditions were met, there was no "commissionable sale." Appellants' commissions were predicated on a successful sale, and unless a sale met both conditions, there was in fact no sale.

Appellants executed acknowledgments indicating they read and understood the Agreement, which specified that commissions were payable only on commissionable sales, i.e., subscriptions that were verified sales and were kept by the customer for at least 28 days. Appellants' right to commissions therefore must be governed by the provisions of the Agreement. (*Lucian v. All States Trucking Co.* (1981) 116 Cal.App.3d 972, 975 [171 Cal.Rptr. 262] [employees who voluntarily left employment before end of accounting period not entitled to pro rata share of profits under bonus incentive plan requiring employee to work the entire accounting period before benefits vested]; *Commeford v. Baker* (1954) 127 Cal.App.2d 111, 117 [273 P.2d 321] (*Commeford*) [employees' right to commission determined by terms of their contract].) "[T]he right of a salesman or any other person to commissions under given circumstances depends upon the terms of his contract for compensation." (*Commeford,* at p. 118.)

The essence of an advance is that at the time of payment the employer cannot determine whether the commission will eventually be earned because a condition to the employee's right to the commission has yet to occur or its occurrence as yet is otherwise unascertainable. An *advance,* therefore, by definition is not a *wage* because all conditions for performance have not been satisfied.

Courts have found enforceable the terms of employment agreements providing for payment of commissions upon certain postsale conditions where the salesperson's duties included not only the initial sale but substantial follow-up services to be performed in the future. (*Bach v. Curry* (1968) 258 Cal.App.2d 676, 680 [66 Cal.Rptr. 220] [conditioning receipt of "service fees" upon insurance agent's continued employment found valid where agent

voluntarily left employment in light of importance of maintaining continuing relationship with customer]; *Powis v. Moore Machinery Co.* (1945) 72 Cal.App.2d 344, 354–355 [164 P.2d 822] [upholding agreement providing salesman would receive commissions only after goods were delivered and paid for where duties included not only initial sale of equipment but also invoicing, supervising installation of equipment and instructing customer as to its use].)

*Hudgins* observed that prior cases, such as *Commeford, supra,* 127 Cal.App.2d 111, have dealt with "the issue of when a commission has been earned by a terminated employee on a 'sale' transaction that is not an instantaneous event (as in the context of retail sales) but, rather, is 'completed' over a relatively long period of time during which the sales agent may be required to perform additional services for the customer." (*Hudgins, supra,* 34 Cal.App.4th at p. 1121, fn. 9.) Although the telesales employees in this case had no further responsibilities to the customer and provided no further services to the customer once a sale was verified, the sales transactions in the present case are not instantaneous as in ordinary retail sales. A subscription by definition occurs over a period of time, and the costs of the sale must be recouped over a period which respondent has determined to be 28 days. While no additional services are required from the telesales person over this period, the value of his or her services is realized by respondent only if and after the customer maintains the subscription for the minimum period, i.e., there is in fact a commissionable sale.

Appellants were aware that a sale did not qualify as a "commissionable order" unless and until the customer kept the subscription for 28 days without a stop date. They also knew and agreed that they would receive advances before respondent could ascertain whether the sales would actually ripen into "commissionable orders." Advances on commissions under the Agreement therefore did not constitute payment of wages. The trial court correctly determined the 28-day requirement was a condition precedent to appellants' entitlement to a commission and respondent could charge back any unearned advances from appellants' future advances on commissions.

2. *The Agreement Between Appellants and Respondent Was Not an Illegal Agreement for a Deduction or "Kickback" of Earned Wages*

Appellants argue that section 221 specifically states that any form of taking back "wages" already paid is illegal and the Agreement here is illegal because it takes back their "wages theretofore paid." We do not agree.

Section 221 prohibits an employer from collecting or receiving any part of "wages theretofore" paid an employee. Section 223 further provides

that "[w]here any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract." ▪ Thus, it is unlawful for an employer to pay less than any contract or statute requires while purporting to pay the required wage.

▪ The Legislature enacted section 221 and its related provisions to proscribe secret deductions or "kickbacks" that made it appear as if an employer was paying wages in accordance with an applicable contract or statute but in fact paying less. (*Hudgins, supra,* 34 Cal.App.4th at p. 1118, citing *Kerr's, supra,* 57 Cal.2d at pp. 328–329.)

▪ Section 221 must be read with its companion statutes rather than in isolation. (*Prudential Ins. Co. v. Fromberg* (1966) 240 Cal.App.2d 185, 192 [49 Cal.Rptr. 475] (*Fromberg*).) Section 224 provides in pertinent part that "[t]he provisions of Sections 221, 222 and 223 shall in no way make it unlawful for an employer to withhold or divert any portion of an employee's wages . . . when a deduction is expressly authorized in writing by the employee to cover . . . deductions not amounting to a rebate or deduction from the standard wage arrived at . . . pursuant to wage agreement or statute . . . ." ▪ Under *Fromberg*, an employee's compensation remains "subject to all the contingencies set forth in the parties' agreement." (*Fromberg*, at p. 192.)

▪ In referring to "wages" paid, section 221 prohibits an employer only from collecting or receiving wages that have already been earned by performance of agreed-upon requirements. Prior cases have sanctioned arrangements whereby an employer makes advances on commissions to employees and later reconciles any overpayments by deductions from future commissions. (See *Korry of California v. Lefkowitz* (1955) 131 Cal.App.2d 389, 393 [280 P.2d 910] [allowing recovery of excess of advances over earned commissions where agreement specifically provided employee would have weekly advance that would be charged against his commissions]; *Agnew v. Cameron* (1967) 247 Cal.App.2d 619, 622, 624 [55 Cal.Rptr. 733] ["it is clearly the law in California that a salesman is required to repay the excess of advances made over commissions earned when there is an express agreement on the part of the salesman to repay such excess"; "when there is an express or implied promise by the salesman to repay excess advances to his principal, the salesman is obliged to repay the surplus 'draws' "].)

Appellants argue that, once paid to an employee, an advance can never be legally "collect[ed]" or "receive[d]" from an employee because it is part of "wages theretofore paid" under section 221. We do not agree.

Each appellant was informed at the time of employment that he or she would be paid the minimum wage plus a commission on any sales where the customer maintains a subscription for at least 28 days. Under the Agreement, respondent agreed to provide appellants with an advance against his or her future commission and appellants agreed and authorized respondent to deduct from his or her future advance "the amount advanced in respect to [a] rejected subscription . . . based on [his or her] commission rate for [the] current week . . . ."

It was stipulated that each telesales employee received his or her full hourly statutory minimum wage regardless of the net level of sales during a given pay period. Appellants therefore received a lawful compensation for their hours of work. Under the Agreement, telesales employees were further provided with an opportunity to obtain additional compensation for their productivity based on commissionable sales. Appellants were on notice and agreed that their future commission advances were subject to a charge-back for past advances that failed to qualify as an earned commission. The Training Manual specifically informed appellants that they should make one "Everyday" sale an hour or 30 "Everyday" sales per week and they should attempt to get two extra sales a day to cover anticipated charge-backs.

 A charge-back on future commission advances does not take back wages "theretofore paid" or encompass an improper or unfair deduction to an employee's wages. As respondent explains, when a charge-back occurs, respondent does not take back wages from telesales employees. Respondent merely reduces the amount of the next advance to the employee to account for the fact that the earlier advance never ripened into a commissionable order. Such advances allow an employee immediate access to cash rather than having to wait until all contingencies, such as the 28-day waiting period here, have been satisfied and provide an incentive to increase sales for the employer. Appellants bear the reasonable risk that the customer may not retain the subscription for at least 28 days, in which case the minimum hourly wage serves as his or her compensation for the time spent. Respondent correspondingly bears the risks of the customer not paying the bill at all or canceling on or after the 29th day. If the sale is commissionable, a telesales employee receives his or her full commission. Payment of a commission does not depend in any way on whether the customer pays for the subscription. Even if the customer fails to pay for a commissionable subscription, respondent bears the costs of initiating the subscription, billing, collecting and maintaining the subscription and all the attendant costs of producing and delivering its newspaper.

In this way, a highly productive employee could increase sales and, thus, profits for his or her employer and at the same time be rewarded for the

increased value of his or her labor. Such advances work to the benefit of employees and are to be encouraged, since they provide present income even though subject to adjustment once initial sales have been reconciled with commissionable sales. On the other hand, if appellants are correct that once paid an employer can never recoup advanced commissions from an employee, an employer would not maintain such a practice because it would shift the risk of cancellation prior to the expiration of the 28-day period to the employer.

Compensating employees in part with advances on commissions is a long-standing practice. No prior case has held the practice to violate the California Labor Code, and we are pointed to no statute that expressly bars such a practice. In view of its widespread nature, we are loath to hold the Labor Code bars such a practice by implication. Should we hold such a beneficial arrangement in violation of statute, the most likely result would be the elimination of commissions and any incentive or opportunity for employees to earn income exceeding their hourly wage in proportion to their efforts.

Appellants cite *Boothby v. Atlas Mechanical, Inc.* (1992) 6 Cal.App.4th 1595 [8 Cal.Rptr.2d 600], for the proposition that California law makes it extremely difficult for anyone, including an employer, to simply take money from an employee's wages. *Boothby*, however, is of no assistance to appellants. In *Boothby*, the court held that a proportionate right to a paid vacation vests as labor is rendered, and a forfeiture of vested vacation pay by an employee's failure to take a vacation during a prescribed time period is a violation of applicable statutes. (*Id.* at pp. 1601–1602.) Even so, the court held an employment agreement that precludes an employee from accruing more vacation time, after he or she accumulates a certain amount of unused vacation time, is not an attempted illegal forfeiture of vested vacation. (*Id.* at p. 1602.) "A 'no additional accrual' policy simply provides for paid vacation as part of the compensation package until a maximum amount of vacation is accrued." (*Ibid.*) In the present case, even if commissions may be earned when the sale is made, the employer may properly condition the right to receive the commission upon the customer keeping the subscription for at least 28 days without an illegal forfeiture.

Relying on *Barnhill v. Robert Saunders & Co.* (1981) 125 Cal.App.3d 1, 6 [177 Cal.Rptr. 803], appellants contend that a paycheck belongs to an employee and the employer "may not use self-help to offset claims that money previously paid was just an un-earned advance." In *Barnhill*, the court held that an employer could not set off a debt owing it by an employee against the employee's wages. "Permitting [an employer] to reach [an employee's] wages by setoff would let it accomplish what neither it nor any other creditor could do by attachment and would defeat the legislative policy

underlying that exemption." (*Ibid.*) *Barnhill,* however, merely held that an employer could not take advantage of its status as an employer to place itself at an advantage over other creditors by unilaterally recouping a debt from its employee's paycheck. (*Ibid.*)

That, however, is not the case here. The charge-back procedure was used to reconcile unearned commissions by reducing the next advance to the employee against commissions. Such a procedure is permissible under *Fromberg, supra,* 240 Cal.App.2d 185, where the court found an employer's practice of advancing sums to its salesperson that were then charged back against the salesperson's actual commissions to equalize his take-home pay did not violate California law. (*Id.* at pp. 188, 192.)

Incentive salary plans, as in *Fromberg* and the present case, differ from self-help situations as in *Phillips v. Gemini Moving Specialists* (1998) 63 Cal.App.4th 563, 567 [74 Cal.Rptr.2d 29], where the employer attempted to collect a debt owed by its employee by unilaterally deducting the debt from his wages without his consent. Indeed, *Phillips* itself distinguished its facts from the incentive salary plan in *Fromberg,* noting that "Prudential's withholding of its advances from the plaintiff's commissions was simply in accordance with its salary plans." (*Phillips, supra,* at p. 574, fn. 5.) Here, as in *Fromberg,* the withholding of advances from commissions was simply in accordance with the Agreement entered into by appellants and respondent.

Since appellants read, signed, acknowledged and received the Agreement at the onset of their employment, appellants were well aware that sales were not commissionable unless the customer kept the subscription for at least 28 days. Each appellant was also aware that he or she was to receive "an advance against [his or her] commissions" equal to the commissions attributable to the preceding pay period. Each was further aware of respondent's charge-back procedure and each signed an acknowledgement that he or she had read and understood what was set forth. In those acknowledgements, each appellant stated he or she "hereby authorize[d] such deductions" to be taken from his or her "compensation payable subsequent to the date of such rejection based on [his or her] commission rate for [the] current week."

The Agreement between appellants and respondent was therefore not an illegal agreement for a deduction or "kickback" of earned wages.

3. *Cases Holding That an Employee Cannot Be Charged with Business Losses Do Not Apply*

Appellants contend that because wages are accorded special consideration in California, sections 221 and sections 400 through 410 prohibit deductions

from an employee's wages for business losses unless the employer establishes the loss was caused by a dishonest or willful act, or by the culpable negligence of the employee. (*Hudgins, supra,* 34 Cal.App.4th at p. 1111.)

In urging this position, appellants rely on a series of cases relating to an employer's deductions from wages for cash or merchandise shortages or other business losses. (*Kerr's, supra,* 57 Cal.2d 319; *Quillian, supra,* 96 Cal.App.3d 156; *Hudgins, supra,* 34 Cal.App.4th 1109; *Ralphs Grocery Co. v. Superior Court* (2003) 112 Cal.App.4th 1090 [5 Cal.Rptr.3d 687] (*Ralphs Grocery*).) We find such cases inapplicable.

*Kerr's, Quillian, Hudgins* and *Ralphs Grocery* all hold that an employer cannot force an employee to become an insurer of the employer's business by making deductions for *cash, merchandise and other business shortages* from an employee's wages. Indeed, in holding deductions for unidentified sales returns unlawful, *Hudgins* implicitly sanctioned deductions for *identified* sales returns where the individual sales associate was required to return a commission because a sale he or she had made was rescinded. (See *Hudgins, supra,* 34 Cal.App.4th at p. 1122 ["As to identified returns, the sale is reversed and the individual sales associate is required to return the commission because *his or her* sale was rescinded"].) As in *Hudgins,* the sales in question here were in effect "rescinded," making advanced commissions subject to charge-back, by the customer's failure to keep the subscription for at least 28 days.

As explained above, respondent's charge-back policy does not hold appellants personally financially responsible for cash or merchandise shortages or business losses. Respondent merely imposed reasonable conditions on payment of commission. In charging excess advances to future advances on commission, respondent is not "taking back" any of the wages "therefore paid" or charging any "business losses" to appellants.

4. *Appellants' Remaining Causes of Action Are Not Viable*

Appellants conceded at the hearing in the trial court that the claims for waiting time penalties and violation of the unfair competition law are derivative of their claim for unlawful charge-backs. Accordingly, we need not separately discuss these claims.

In any case, these claims fail on their merits.

Section 203 provides, in pertinent part: "If an employer willfully fails to pay, without abatement or reduction, . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action

therefore is commenced; but the wages shall not continue for more than 30 days. . . ." Because respondent did not violate section 221, there was no failure to pay "without abatement or reduction," and appellants are not entitled to any waiting time penalties under section 203.

While an employer's policy or practice that violates the Labor Code may also be held an "unlawful business practice" under Business and Professions Code section 17200 et seq. (see *Hudgins, supra*, 34 Cal.App.4th at p. 1126), where, as here, an employer's policy is lawful and permissible, there is no basis for relief under the unfair competition law. (See *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 827–830 [135 Cal.Rptr.2d 1, 69 P.3d 927].)

## DISPOSITION

The judgment is affirmed. Respondent is to recover its costs on appeal.

Rubin, Acting P. J., and Boland, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 11, 2005. Kennard, J., and Chin, J., were of the opinion that the petition should be granted.