[No. B200083. Second Dist., Div. Seven. May 13, 2008.]

DANIEL C. PRICE, Plaintiff and Appellant, v.
CONNOLLY-PACIFIC CO., Defendant and Respondent.

**COUNSEL**

McGuinn, Hillsman & Palefsky, John R. Hillsman; Law Offices of Charles D. Naylor and Charles D. Naylor for Plaintiff and Appellant.

Cox, Wootton, Griffin, Hansen & Poulos, Richard C. Wootton, Mitchell S. Griffin and Christopher S. Kieliger for Defendant and Respondent.

**OPINION**

**WOODS, J.—**

### INTRODUCTION

This appeal involves an admiralty claim. For purposes of focus and orientation it appears prudent to state the grounds for state court jurisdiction in the opening portion of the opinion. Article III of the United States Constitution gives federal courts exclusive jurisdiction over all admiralty and maritime matters, but 28 United States Code section 1333(1) grants state courts concurrent jurisdiction under the so-called "saving to suitors clause." This clause provides for in personam remedies which "means that an injured party may have claims arising from a single accident under both federal maritime and state common or statutory law. State remedies under the savings to suitors clause may be pursued in state court or, if there is a basis for federal jurisdiction, in federal court. [Citation.] A maritime claim brought in the common law state courts is governed by federal maritime law, however." (*Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 563 [42

Cal.Rptr.2d 697].) This is sometimes referred to as the reverse-*Erie*[1] doctrine. This appeal does not raise an issue of jurisdiction.

The case was tried without a jury. No material facts are in dispute. The parties filed a document in the trial court on December 7, 2006, entitled "Stipulated Findings of Fact and Conclusions of Law."

Plaintiff and appellant Daniel C. Price (Price) is a "seaman" under the terms and conditions of the Jones Act which was enacted in 1920 to give protection to any seaman injured in the course of employment. The Jones Act was codified in title 46 United States Code Appendix section 688 and renumbered title 46 United States Code Appendix section 30104 on October 6, 2006, pursuant to Public Law No. 109-304, 120 Stat. 1485. This appeal does not raise an issue of Price's status as a seaman under the Jones Act.

Price was an operating engineer, a licensed merchant mariner, and a crewmember of a special purpose derrick barge named the "Long Beach." At all times relevant, the Long Beach was owned and operated by defendant and respondent, Connolly-Pacific Co. (Connolly).

Price is referred to in this litigation as a "commuter seaman" or sometimes as a "brown water seaman." These terms are contrasted with the term "blue water seaman." As the names imply, commuter seaman are those employees who commute to and from their place of employment but are not required to live aboard the vessel where they are employed. Blue water seamen, by contrast, live aboard a vessel by necessity in most instances by virtue of the vessel's activity in offshore or distant waters.

Price's affliction was caused by a vector-borne sickness commonly called "West Nile encephalitis," as a result of being bitten by mosquito carriers. The sickness resulted in his being unable to return to work for Connolly and more specifically to the Long Beach, which led to his termination of employment by Connolly.

Price sued Connolly in the Los Angeles County Superior Court contending that he was entitled to "maintenance and cure." Price states in his opening brief on appeal that "The term 'maintenance' refers to a vessel

---

[1] The *Erie* doctrine (*Erie R. Co. v. Tompkins* (1938) 304 U.S. 64 [82 L.Ed. 1188, 58 S.Ct. 817]) requires that a federal court sitting in diversity jurisdiction over a state law claim must apply state substantive law in resolving a dispute. However the extent to which state law may be used to remedy *maritime* injuries is constrained by a so-called reverse-*Erie* doctrine which requires that substantive remedies afforded by the states conform to governing federal maritime standards. (*Hutchins v. Juneau Tanker Corp.* (1994) 28 Cal.App.4th 493, 499 [33 Cal.Rptr.2d 542].)

owner's centuries-old duty to provide ill or injured seamen with food and lodging up to the point of maximum medical recovery, and 'cure' entails the concomitant obligation to provide all necessary medical care." Price cites *Gardiner v. Sea-Land Service, Inc.* (9th Cir. 1986) 786 F.2d 943, 945–946 for these definitions. Connolly does not take issue with these definitions.

The gravamen of Connolly's defense and denial of its obligation to provide maintenance and cure in this instance is the failure of Price to carry his burden of proof to show that the mosquito bite or bites occurred while Price was in the service of a ship, namely, the Long Beach. The trial court was ultimately persuaded, after an extensive and well-argued bench trial with penetrating questions from the court, that Price had failed to carry his burden of proof.

With these introductory comments in mind we now turn to giving a more complete statement of the facts and proceeding in the trial court.

### FACTUAL AND PROCEDURAL SYNOPSIS

As indicated, the parties filed a document in the trial court entitled "Stipulated Findings of Fact and Conclusions of Law." According to the stipulation, the relevant facts are summarized as follows:

Connolly is a marine construction contractor based in Long Beach Harbor. Its work includes the construction, demolition, and repair of piers, wharves, docks, and other waterfront facilities. Connolly's work in 2004 included a pier reconstruction project at berth 100 in the Port of Los Angeles.

Appellant Price was a marine construction worker who resided in La Mesa, in San Diego County. In August, 2004, appellant was a member of the Operating Engineers Union, Local No. 12 (Local 12). Local 12 was a party to a collective bargaining agreement with Connolly and dispatched workers to Connolly pursuant to that agreement, to work on projects in the Los Angeles/Long Beach harbor area.

On August 5, 2004, Local 12 dispatched appellant to Connolly, which assigned him to work at the pier reconstruction project at berth 100 as the winch operator on the Long Beach. Connolly employed appellant as a "seaman" within the meaning of the Jones Act (46 U.S.C. Appen. § 688(a)) throughout his employment at berth 100. He worked on board the derrick barge five days a week, Monday through Friday, from 7:00 a.m. to 3:30 p.m. Because his home was so far from the jobsite, appellant requested permission to park his camper truck in a Connolly parking lot near the jobsite so he

could live there during the workweek. Connolly granted permission and appellant only returned home to La Mesa on weekends.

The collective bargaining agreement between Connolly and the unions who represented the members of the derrick barge crew did not require Connolly to provide any crewmembers with a commuting or housing allowance or to allow them to stay in the company parking lot. Connolly agreed to appellant's request to live out of his camper truck on company property solely as an accommodation to him, i.e., so he did not have to rent space in a trailer park or make the 240-mile round trip daily between his home and the job. The rest of the crew lived in the Los Angeles area and made the daily commute to the job.

Appellant typically met the rest of the barge crew at the project staging area at 6:30 a.m. each morning, rode a crew boat to the Long Beach, spent the entire workday aboard the barge, and took a crew boat back to shore about 3:00 p.m. Once he returned to shore at the end of his shift, he had no job responsibilities to Connolly until he reported back to the job the next morning. The collective bargaining agreement did not require appellant to work overtime or to return to the barge in the event of an emergency. Connolly did not require him to perform any work of any kind after his shift ended as consideration for allowing him to camp at the parking lot, nor did he perform any service for Connolly after the end of each day's shift. Once his shift ended each day, his time was his own and he could and did do as he pleased.

Appellant was generally in the Port of Los Angeles area, either working on the barge or camping in the parking lot, from the morning of August 5, 2004, through the evening of August 6, from the morning of August 9 through the evening of August 13, and from the morning of August 16 through the evening of August 19. He felt normal and healthy until he started feeling ill Saturday, August 21, while he was spending the weekend at his home in La Mesa.

Appellant's symptoms worsened over that weekend. He saw his family physician on Monday, August 23 and was hospitalized on Tuesday, August 24 when he was diagnosed with West Nile virus. He never returned to work for Connolly.

The West Nile virus has a three-to-14-day incubation period, which means that the mosquito which infected appellant bit him sometime between August 7 and August 18. He suffered multiple mosquito bites during that period, and although he claims he was bitten once by a mosquito while working, he signed a company injury/illness report indicating that there was "no way to

tell" when he was bitten other than that it was "some time during the week of 8-16 through 8-19." Appellant admitted that neither he nor anyone else can say for certain just where or precisely when he was bitten by the mosquito or mosquitoes that infected him with the virus.

The trial court was also presented with stipulated scientific evidence indicating that appellant was far more likely infected with the disease at night while he was camping out in the parking lot, than during the day while working on Connolly vessel.

## QUESTION FOR DETERMINATION

In his opening brief, Price maintains that this case is a simple one with one key issue to be resolved by this court. In assisting this court in focusing on the parameters of the lone issue, as contended by Price, he states as follows: "This case presents just one question for determination: [¶] 1. As restated in Article II of the Ship owner's Liability Convention ('SLC'), 54 Stat. 1693, § 2, T.S. No. 951, 1939 WL 39333, the traditional 'American standards' for maintenance and cure make vessel owners liable to seamen for *any sickness* 'occurring between the date specified in the articles of agreement for reporting for duty and the termination of the engagement.' Do those standards make a barge owner like Connolly-Pacific liable to a 'commuter seaman' like Dan Price for a vector-borne sickness like West Nile encephalitis, which indisputably occurred between the beginning and ending dates of his engagement, but which was not necessarily contracted, aggravated, or manifested during his regular work hours aboard the vessel?" (Original italics.)

We do not discern any major disagreement by Connolly with the manner in which Price has chosen to state the key issue for determination by this court on appeal. Connolly, of course, champions the resulting decision reached by the trial court in its favor, and criticizes Price for failing to articulate the simple question on appeal more directly, which, according to Connolly should be couched in the following manner: "Though the Appellant wants to propel the Court into a complicated exercise that starts with a dissection of several sentences in the Shipowner's Liability Convention of 1936 ('SLC') and then works backwards into the case law, using his reading of the SLC to reinterpret the meaning of decades of maintenance and cure cases, the real question for determination is much more simple and direct: did the Appellant contract his disease or did his disease become manifest 'in the service of the vessel,' so that he would be entitled to receive maintenance and cure?"

## STANDARD OF REVIEW

As to the standard of review to be utilized on appeal, we observe that there is no disagreement by counsel.

As correctly stated by Price, "The standard of review herein is *de novo*. 'Because the issues were presented on stipulated facts, the trial court ruled solely on questions of law.' *Steinhebel v. Los Angeles Times Communications LLC* (2005) 126 [Cal.App.4th] 696, 704 [24 Cal.Rptr.3d 351]. The Court of Appeal therefore reviews the judgment *de novo. Id.* The interpretation of an international treaty is also a question of law, so the trial court's reading of the SLC is likewise subject to *de novo review. Arbulich v. Arbulich* (1953) 41 [Cal.2d] 86, 99 [257 P.2d 433]." (Original italics.)

## *DISCUSSION*

■ Price essentially concedes he could not establish that his West Nile virus illness was caused by his service to the ship or that he contracted the virus or manifested symptoms while in the service of the ship.[2] The trial court found—and Connolly argues on appeal—under well-established case law, absent such proof, Price is not entitled to maintenance and cure. (E.g., *Stevens v. McGinnis, Inc.* (6th Cir. 1996) 82 F.3d 1353, 1357–1358 ["[T]he following rule is often repeated: A shipowner must pay maintenance and cure for any illness or injury which occurred, was aggravated, or manifested itself while the seaman was in the ship's service." (italics omitted)]; *Wills v. Amerada Hess Corp.* (2d Cir. 2004) 379 F.3d 32, 52–53 ["Ordinarily, the no-fault obligation of shipowners to provide maintenance and cure extends only to a seaman who becomes ill or injured while 'in the service of the ship.' [Citation.] A seaman whose illness or injury manifests after conclusion of his or her employment with the shipowner is generally not entitled to recover for maintenance and cure absent 'convincing proof of causal connection' between the injury or illness and the seaman's service."]; see *The Osceola* (1903) 189 U.S. 158, 175 [47 L.Ed. 760, 23 S.Ct. 483] ["the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued"]; *Vaughan v. Atkinson* (1962) 369 U.S. 527, 531 [8 L.Ed.2d 88, 82 S.Ct. 997] ["[m]aintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service . . ."]; see generally *Aguilar v. Standard Oil Co.* (1943) 318 U.S. 724, 737 [87 L.Ed. 1107, 63 S.Ct. 930] [seaman entitled to maintenance and cure even if he falls ill or is injured while ashore as long as seaman was subject to the call of duty].)

Notwithstanding this overwhelming authority to the contrary, Price urges two alternative grounds for reversing the trial court's ruling and recognizing his right to maintenance and cure against Connolly. First, relying on language

---

[2] To be " 'in the service of the ship' " or vessel, a seaman "must be generally answerable to its call to duty rather than actually in performance of routine tasks or specific orders." (*Farrell v. United States* (1949) 336 U.S. 511, 516 [93 L.Ed. 850, 69 S.Ct. 707].)

in the Shipowners' Liability Convention of 1936 (SLC) and the United States Supreme Court's observation the SLC is declaratory of preexisting American law (*Warren v. United States* (1951) 340 U.S. 523, 527–528 [95 L.Ed. 503, 71 S.Ct. 432]), Price argues a seaman need not prove an illness—as opposed to an injury—was incurred, aggravated or manifested itself while in the service of the vessel, but only that the illness was incurred, aggravated or manifested itself during the period of employment (that is, between the date of hire and the date his or her employment ended). Second, even if the seaman is not on call or otherwise engaged in an activity generally considered to be in the service of the vessel, Price contends maintenance and cure is required if an illness is contracted while the seaman is participating in an onshore activity that benefits the employer, a principle that Price asserts includes his overnight RV-camping in Connolly's parking lot.

■ As to the first argument, like the trial court, we disagree with Price's interpretation of the language of the SLC—putting aside the question of its applicability to commuter seamen who do not navigate the "high seas." (See generally *Vella v. Ford Motor Co.* (1975) 421 U.S. 1, 6 & fn. 5 [43 L.Ed.2d 682, 95 S.Ct. 1381] [concluding it was unnecessary to address whether SLC is applicable to Great Lakes shipping and noting, "The United States' reservation to the Convention provides: '[T]he United States Government understands and construes the words "maritime navigation" appearing in this Convention to mean navigation on the high seas only.' "].) The SLC provides in article II, paragraph 1(a), the shipowner is generally liable for maintenance and cure for sickness and injury "occurring" between the date specified in the shipping articles for reporting for duty and the date of termination of the engagement. Article II, paragraph 2(a), of the SLC permits an exception from this broad obligation to provide maintenance and cure for an "injury incurred otherwise than in the service of the ship." Other permissible exceptions to the obligation to provide maintenance and cure, however, include both injury or sickness; for example, article II, paragraph 2(b), excludes injury or sickness due to the willful act, default or misbehavior of the seaman. Because injury, but not sickness, "incurred otherwise than in the service of the ship" may be excluded from the scope of shipowner liability, Price argues under the SLC the shipowner must provide maintenance and cure for any illness occurring during the period of employment.

■ Price misinterprets the SLC's very careful use of language. As the trial court explained, under general maritime law a shipowner is liable for maintenance and cure not only when a seaman's illness is caused by service to the ship or contracted during service to the ship but also when the illness manifests itself during the seaman's service to the ship. (E.g., *Sana v. Hawaiian Cruises, Ltd.* (9th Cir. 1999) 181 F.3d 1041, 1044–1045; *Shaw v. Ohio River Company* (3d Cir. 1975) 526 F.2d 193, 198–199.) Thus, an illness "incurred"—that is, contracted—other than in the service of the ship may

well be compensable, provided the symptoms manifested themselves while the seaman was in the service of the vessel, a prerequisite Price cannot satisfy in this case because he did not start feeling ill until Saturday, August 21, 2004, while spending the weekend at his home, and did not thereafter return to work on the vessel. Nothing more can be read into this language of the SLC; nothing more is supported by established American law, which the SLC reinforces but does not expand. (See *Warren v. United States, supra,* 340 U.S. at p. 527 [SLC does not materially change American standards for maintenance and cure].)

■ Price also misapprehends the significance of the SLC's use, in article II, paragraph 2(a), of the inclusive dates of the seaman's employment, rather than the term "in the service of the vessel," to define the scope of potential liability for maintenance and cure. In cases involving blue water seamen American courts have liberally interpreted "in the service of the vessel" because of the unique employment circumstances of these workers: "Unlike men employed in service on land, the seaman, when he finishes his day's work, is neither relieved of obligations to his employer nor wholly free to dispose of his leisure as he sees fit. Of necessity, during the voyage he must eat, drink, lodge and divert himself within the confines of the ship. In short, during the period of his tenure the vessel is not merely his place of employment; it is the framework of his existence." (*Aguilar v. Standard Oil Co., supra,* 318 U.S. at pp. 731–732.) As a result, while on shore leave—and, indeed, generally from the time they sign their shipping articles until their engagement under those articles ends—blue water seamen are regarded as being in the service of their vessel.

As explained in *Aguilar v. Standard Oil Co., supra,* 318 U.S. 724, in which the Supreme Court found a seaman on shore leave in a foreign port was in the service of his vessel when he was injured in a dance hall, shore leave is a necessary and beneficial antidote for the confinement and rigid discipline to which blue water seamen are subjected by virtue of their employment aboard ship. As such, shore leave is considered to be in the service of the vessel. "The voyage creates not only the need for relaxation ashore, but the necessity that it be satisfied in distant and unfamiliar ports. If, in those surroundings, the seaman, without disqualifying misconduct, contracts disease or incurs injury, it is because of the voyage, the shipowner's business. That business has separated him from his usual places of association. By adding this separation to the restrictions of living as well as working aboard, it forges dual and unique compulsions for seeking relief wherever it may be found. In sum, it is the ship's business which subjects the seaman to the risks attending hours of relaxation in strange surroundings. Accordingly, it is but reasonable that the business extend the same protections against injury from them as it gives for other risks of employment." (*Id.* at pp. 733–734; accord, *Warren v. United States, supra,* 340 U.S. at p. 530 [maintenance and cure obligation is

equally applicable to injuries actually received on land "during the period of relaxation while on shore as it is to those received while reaching it"]; see *Ellis v. American Hawaiian S. S. Co.* (9th Cir. 1948) 165 F.2d 999, 1001 [finding seaman's injury suffered from diving into swimming pool occurred in the course of employment since seaman was on shore leave in a foreign port].)

■ Given this expansive definition, proof an injury or illness occurred, was aggravated, or manifested itself during the blue water seaman's term of employment will also generally establish it occurred, was aggravated, or manifested itself while the seaman was in the service of the vessel. Absent contrary evidence or proof of other disqualifying misconduct (for example, concealment of a preexisting injury or illness), the blue water seaman is entitled to maintenance and cure. (See *Bencic v. Marine Traders, Inc.* (D.Del. 1966) 255 F.Supp. 561, 563–564 [seaman establishes prima facie case for maintenance and cure by proving he was injured between beginning and ending dates of employment; burden then shifts to shipowner to rebut prima facie showing by proving either injury occurred otherwise than in service of ship or was caused solely by seaman's willful misbehavior].) Article II, paragraph 2(a), of the SLC—an international treaty applicable to seaman required to sign shipping articles and engaged in " 'navigation on the high seas only' " (*Vella v. Ford Motor Co., supra,* 421 U.S. at p. 6, fn. 5)—simply recognizes that "in the service of the vessel" is generally coextensive with the term of employment for blue water seamen.

■ The elements necessary to establish a commuter seaman's right to maintenance and cure are no different from those for a blue water seaman; but, as Price recognizes, "in the service of the vessel" is a far narrower concept in the commuter context. As the trial court accurately summarized, "[A] blue water seaman on shore leave is typically answerable to the call of duty and consequently in the service of the ship, while a commuter seaman whose shift has just ended is typically *not* answerable to the call of duty and therefore not in the service of the ship." (See, e.g., *Shaw v. Ohio River Co., supra,* 526 F.2d at pp. 194, 198 [shipowner not liable for illnesses that manifested themselves while commuter seaman onshore and not answerable to call of duty]; *Foret v. Co-Mar Offshore Corp.* (E.D.La. 1981) 508 F.Supp. 980, 982 [commuter seaman injured on shore entitled to maintenance and cure only upon "showing that the seaman was acting pursuant to some employer directive or that the employer was a recipient of some benefit as a consequence of the seaman's shoreside activity"].) ■ While spending the night in his camper truck in his employer's parking lot, Price was under no obligation to perform any services for the shipowner and was not in any way answerable to the "call of duty." (See *Baker v. Ocean Systems, Inc.* (5th Cir. 1972) 454 F.2d 379, 384 ["it is clear as a matter of law that the seaman's answerability to the 'call to duty' imports at the very least some

binding obligations on the part of the seaman to serve"].) That Price's illness may have been contracted between his date of hire and the date his employment on the Long Beach ended does not justify an award of maintenance and cure.

As an alternative argument, Price asserts a commuter seaman is entitled to maintenance and cure if he is injured or falls ill while engaged in an onshore activity that benefits the shipowner, even if the seaman is not answerable to the call of duty or in the service of the vessel as those terms have traditionally been understood. In support, Price cites several cases in which a commuter seaman's right to maintenance and cure has been recognized when the seaman was injured while traveling to or from the site of employment. For example, in *Vincent v. Harvey Well Service* (5th Cir. 1971) 441 F.2d 146, 150, a commuter seaman was awarded maintenance and cure after he was injured while riding in a vehicle provided by the employer to transport workers from a gathering point inland to the dock. In *Williamson v. Western Pacific Dredging Corp.* (9th Cir. 1971) 441 F.2d 65, maintenance and cure was awarded to the family of a barge hand killed in an automobile accident on his way to work. Unlike the *Vincent* case, the seaman was driving his own vehicle, but the seaman was paid for his travel time. The Court of Appeals affirmed the award, based on "the district court's finding, supported by the record, that commuting was part of the job plaintiff's decedent was employed to perform—that in the circumstances of this case 'the hazards of the journey may fairly be regarded as the hazards of the service.' " (*Williamson*, at p. 66.)

Price argues Connolly's accommodation of his request to camp in the company's parking lot "to spare him the grueling commute between its work site on San Pedro Bay and his home in San Diego County" benefited not only him but also the shipowner: Although not in any way part of the employment agreement, it was, in effect, an inducement for him to work on the Long Beach. Therefore, Price reasons, like the provision of a company car to transport commuting seamen, allowing him to camp in the parking lot transformed the risk of a mosquito bite while sleeping into a hazard of service.

We have great difficulty equating traveling to work on company time or in a company car with camping out, outside of work hours and without charge, in a company-owned parking lot. Thus, even if *Vincent v. Harvey Well Service, supra*, 441 F.2d 146, and *Williamson v. Western Pacific Dredging Corp., supra*, 441 F.2d 65, represent an expansion in the scope of "in the service of the vessel" for commuter seamen, Connolly's generosity in allowing Price to use

his RV camper in an otherwise empty parking lot, without more, is an insufficient basis on which to award him maintenance and cure.[3]

## DISPOSITION

The judgment is affirmed. Respondent to recover costs of appeal.

Perluss, P. J., and Zelon, J., concurred.

A petition for a rehearing was denied June 3, 2008.

---

[3] We are quick to note that Price has not been deprived of relief for his medical condition since the Operating Engineers Health and Welfare Trust Fund (the fund which pays for each Local 12 member dispatched to its jobs under the collective bargaining agreement) paid approximately $197,000 in medical care and treatment on behalf of Price.